**H. B. CALHOUN, Jr., Plaintiff,**

v.

**MIDSTATE CONTRACTORS, Inc., a
corporation, Defendant.**

**Civ. A. No. 1516.**

United States District Court
W. D. North Carolina.
Statesville Division.
Nov. 1, 1956.

Harkins, Van Winkle, Walton & Buck, Asheville, N. C., for plaintiff.

Patrick & Harper, Hickory, N. C., for defendant.

WARLICK, District Judge.

Plaintiff, a citizen of Tennessee, brings this action against the defendant, a North Carolina corporation, with its place of business in Hickory, Catawba County, in the Western District of North Carolina, to recover certain monies alleged by him to be due under the terms of a contract entered into between the parties.

Jurisdiction comes about from diversity of citizenship and the amount sought as a recovery in good faith.

On June 10, 1955, the defendant was low bidder on Blue Ridge Parkway Project 2US–V6, and as such low bidder was awarded the general contract on June 28, 1955 by that agency of the United States engaged in the work of completing said Parkway. As such general contractor the defendant, on June 15, 1955, entered into a contract with the plaintiff by the terms of which it sublet to plaintiff some of the work to be done as was required under its prime contract of construction. The contract was in writing and was executed by plaintiff and defendant.

In this sub-contract plaintiff was:

"To Perform the Following Items of Work

| Item | | | |
|---|---|---|---|
| 24 (1) | Unclassified Excavation | 12,000 cu yds @ | $1.15 |
| 35 (1) | Soil Replacement | 2,500 cu yds @ | .80" |

The original grading of this portion of the project had been completed prior to World War II and through those years had eroded considerably and was covered with a growth of young trees, sprouts, and other debris which necessitated much

basic work. A strict performance clause was incorporated in the contract and the work was to be performed according to specifications of the Federal Bureau of Public Works.

Under Item 24(1) of the contract plaintiff was required to scale certain of the slopes, and to flatten others in accordance with the cross-sectional drawings and was to round the tops of many of the banks and slopes and do a considerable amount of fine grading; this type of work making up the estimated 12,000 cubic yards of unclassified excavation. The dirt that came about from this work on the banks and slopes and the fine grading thereof was to be hauled and placed in designated fills and the slopes, banks and fills, when completed were to be finished so that the whole of the area would be ready for seeding by those who held the contract for that work.

The scaling operation required the removal of all loose dirt, rocks, roots, stumps, any overhanging substances, and levelling off of all irregularities in the soil.

Item 35(1) required topsoil replacement so that a proper seed bed could be had. This soil replacement was estimated to contain 2,500 cubic yards.

Plaintiff represented to the defendant that he had a full knowledge of this type of work and that he had all needed machinery for completing his job, as required by the contract and that his employees were experienced.

Plaintiff began work under his contract with the defendant on July 14, 1955 and prior thereto had been told by defendant that it had only 120 calendar days to complete the entire project and that the seeding contract had to be finished by September 15; that time was the essence of the contract and that after the expiration of the allotted time for its completion the defendant would be subject to a penalty of $50 for each day thereafter.

Plaintiff likewise was fully aware that the work which had been sub-let to him was among the first of the various items under the contract which had to be completed so that the latter stages of the project could be undertaken in consecutive order.

At the time plaintiff began work on July 14 and up to and including July 27, he and his two employees actually worked 59 hours each or a total of 177 hours. In that same period another employee of plaintiff worked one hour. During these thirteen days plaintiff and his employees only moved 230.8 cubic yards of the material and hauled and placed it in the designated fills. This was less than 2% of the contract total. With adequate machinery and properly trained operators plaintiff should have completed the whole of his contract within a five weeks period or certainly not later than around August 20, or 22nd.

In addition thereto approximately 300 cubic yards of unclassified material was pulled down from the banks and slopes but had not been hauled.

On July 27 when it became evident that plaintiff was moving entirely too slowly, it was agreed that the defendant would rent to plaintiff a bulldozer, a front end loader and motor grader, with an operator for each piece of machinery, at the price of 57½¢ per cubic yard of the materials moved and the original contract was accordingly amended by consent. This being done to assist plaintiff in the performance of his contract. Plaintiff then agreed that he would thereafter furnish a dragline and an operator, two dump trucks, and drivers, and all the necessary hand labor. On July 28 and 29 the defendant with its equipment, loaded plaintiff's two trucks and in that period a total of 496.3 cubic yards of unclassified material was graded down, loaded, hauled and placed in the designated fills.

For several days thereafter plaintiff and his employees failed to work. However, on August 1, plaintiff did furnish a dragline and one truck and operators. On that day the engineer and inspector for the government assigned to this project, observing how the work was being done, took exception to the progress being

made by plaintiff and accordingly gave notice to the defendant that it was falling rapidly behind in the schedule for completion and that unless the project was speeded up it could not possibly be completed as the contract required. Plaintiff's delay in performing his part of the contract evidently was holding up and interfering with the performance of the other stages of the project.

With these suggestions from the engineer and on the following day defendant brought on to the job quite a number of its trucks and through necessity took over the work which plaintiff had been undertaking to do. It was suggested to plaintiff that he move such equipment as he had some several miles farther up on the project where the need for completion at that time was not so evident. This plaintiff refused to do and thereupon evidently abandoned the contract and thereafter did no work whatsoever under its terms. Under that situation the defendant with its own employees and equipment, completed the items of work set out in the contract between plaintiff and defendant around the 24th of August, 1955 at an actual cost to it of approximately the same amount as that provided in the contract. The full delay on the project was about one to two weeks but defendant was able to complete its whole contract with the government within the 120 calendar days. In completing the work that was to be done by plaintiff in this length of time, defendant had its employees work ten to twelve hours each day and on several Saturdays and possibly one or two Sundays, for which it was compelled to pay overtime wages. It also hired other workers and machinery.

The evidence clearly indicated to me that plaintiff was never at any time in a position to perform the contract,— that his machinery was inadequate, and his employees untrained for the type of work required. His whole effort seemed to lack that "know how" which is so necessary to bring about a successful operation, particularly one where time is the essence of the contract.

Plaintiff originally sought damage in the sum of $20,000, and thereafter amended his complaint in which he decreased his claim for damage to $10,646.-79. $6,000 of this claimed damage was abandoned during his trial; plaintiff now claims to have suffered damage on account of defendant's alleged repudiation of the contract in the sum of $5,240.96.

The defendant denied liability, setting up a cross action, alleging among other things that plaintiff was due it $1,516.36 for overtime wages paid and other evidences of indebtedness to which it was entitled.

When one considers plaintiff and defendant originally estimated that it would take some four to five weeks to complete the contract, and it is further shown that the defendant, after taking over the contract, was able to complete it within approximately the same length of time as estimated even after the delays, and that this period did not delay the seeding and the other successive steps, one is unalterably driven to the opinion that it was not necessary for the defendant to have expended the amount it paid for the overtime wages and that in so doing it should not recoup such amount. I am of the opinion that it should not therefore recover anything for such overtime wages paid on its cross action.

I conclude from the evidence that plaintiff is entitled to recover for the 230.8 cubic yards of material handled at the contract rate of $1.15 per cubic yard; that he is entitled to recover of the defendant for 496.3 cubic yards of material at the rate of 57½¢ and that he is entitled to recover a further payment for 300 cubic yards of unclassified material pulled down but not hauled, in the sum of $100, making a total of $650.80.

Counsel will present decree.